# United States Court of Appeals
## For the First Circuit

Nos. 12-1835
      12-1858

UNITED STATES OF AMERICA,

Appellee,

v.

TODD LYONS
and DANIEL EREMIAN,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Peter Charles Horstmann, with whom Partridge, Ankner & Horstmann, LLP  was on brief, for appellant Todd Lyons.
Juan Chardiet, with whom Chardiet Law P.C. was on brief, for appellant Daniel Eremian.
John M. Pellettieri, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Mythili Raman, Acting Assistant Attorney General, Denis J. McInerney, Acting Deputy Assistant Attorney General, Carmen M. Ortiz, United States Attorney, and Robert A. Fisher, Mary Beth Murrane, and Fred W. Wyshak, Assistant U.S. Attorneys, were on brief, for appellee.

January 17, 2014

**KAYATTA, Circuit Judge**.  Todd Lyons and Daniel Eremian worked for Sports Off Shore (SOS), a gambling business based in Antigua.  After a wide-ranging investigation by federal and state law enforcement of SOS and its employees and agents, and a lengthy trial, a jury convicted both Lyons and Eremian on two counts under the Wire Act, 18 U.S.C. § 1084, two counts under RICO, 18 U.S.C. §§ 1962(c) and 1962(d), and one count under 18 U.S.C. § 1955 for conducting an illegal gambling business.  Lyons was separately convicted on another eighteen counts.  In this direct appeal from their convictions and sentences, Lyons and Eremian argue that: (1) the district court improperly denied them a safe harbor instruction on the government's charges that they violated the Wire Act; (2) the Wire Act does not apply to the internet; (3) the government did not prove they had the necessary mens rea to violate the Wire Act; (4) their convictions involved an inappropriate extraterritorial application of the Wire Act; (5) their Wire Act convictions should be overturned because the government was required but failed to prove that all relevant bets were on sporting events; and (6) the district court improperly admitted into evidence a directory of SOS agents.

Lyons separately argues that: (7) the district court should have suppressed evidence derived from wiretaps of his phone conversations; (8) the district court should have suppressed evidence obtained pursuant to search warrants for his home, car,

and person; (9) there was insufficient evidence to convict him of money laundering because the government's evidence did not distinguish between "proceeds" and "profits" of illegal gambling; (10) there was insufficient evidence to convict him of violating the Travel Act, 18 U.S.C. § 1952, for the same reason; (11) the absence of final implementing regulations precluded his convictions for violating the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), 31 U.S.C. §§ 5361-67; and (12) the prosecution referred at trial to his decision not to testify, violating his Fifth Amendment right against self-incrimination.

Eremian separately argues that: (13) venue did not lie in Massachusetts; (14) there was insufficient evidence to convict him of racketeering; and (15) instructing the jury on Florida law constituted a constructive amendment of the indictment. Finally, Lyons and Eremian each challenges his punishment, arguing that (16) his prison sentence and the forfeiture judgment were unreasonable and violated the Eighth Amendment.

In the remainder of this opinion, we address these sixteen arguments in the order listed, above. For the reasons stated, we affirm the convictions and sentences, though we affirm Lyons's Wire Act convictions in one limited respect on a basis different from that employed by the district court.

## I.  Background

SOS was a bookmaking business founded in 1996 by Robert Eremian, Daniel Eremian's brother.[1]  SOS centered its operations in Antigua at least in part because some forms of bookmaking are legal there.  Many of SOS's customers, however, were in the U.S. and SOS took bets by phone or over the internet from the U.S.  Most SOS customers bet on team sports, but others bet on horse racing or on casino games played on the SOS website.  SOS allowed bettors to place bets against funds placed on deposit with SOS, or on credit.  Antiguan regulatory law allowed the former but, at least between 2001 and 2007, prohibited betting on credit.

A bettor who wished to place bets on credit with SOS received a password and a customer code for placing bets through the internet or by phone.  SOS employed agents in the United States, including Eremian and Todd Lyons, to "settle up" with credit bettors, collecting losses from losers and making payments to winners.  These agents met with bettors in person in public places and primarily conducted transactions in cash or by receiving checks.  Each agent managed a group of regular customers and received as a commission a percentage of those customers' losses.  Some agents also employed sub-agents who managed their own

---

[1]  This opinion will always refer to Robert Eremian by his full name.  "Eremian," on its own, will be used to refer to Daniel Eremian.

customers and shared commissions with the agents under whom they worked.

After deducting their commissions from the money leftover once customers settled up, the agents sent the balance to SOS in Antigua. Agents often sent this balance in cash, sometimes using a "six pack," a package containing three bundles of $2,000. SOS agents also carried cash to Antigua in person. Agents also transferred or caused their customers to transfer funds to Antigua by check or wire transfer.

Daniel Eremian played an important role in the SOS operation from its inception. He helped his brother establish the SOS office in Antigua, training Antiguan employees about how to answer the phone and take bets. After SOS was established, Eremian returned to the United States where he worked as an SOS agent. He recruited customers in Florida. He also employed at least three sub-agents. Like other SOS agents, Eremian provided bettors with the information needed to place bets with SOS on credit and settled up with customers, either in-person or through his sub-agents. On at least one occasion, Eremian also collected funds from another agent on behalf of SOS.

Todd Lyons came to SOS later than Eremian, but ended up playing a larger role in SOS's Massachusetts operation than Eremian played in Florida. Like many agents, Lyons was a bettor with SOS before he became an agent. But at some point between 1997 and 2000

Lyons became an SOS agent.  Like other SOS agents, Lyons provided customers with the information they needed to make bets.  He also collected losses and  distributed winnings.  Lyons had at least one sub-agent.  In addition to working as an agent, Lyons also served as "the bank" for SOS in Massachusetts, collecting money from, and disbursing it to, other agents.  Starting in 2000, SOS paid Lyons a salary for this managerial role.

Lyons first drew the attention of Massachusetts state police investigating an illegal bookmaker in Boston.  Police and prosecutors sought and received a wiretap of Lyons's cell phone.  This wiretap led to warrants for searches of Lyons's home, car, and person conducted in January, 2006.  The search of Lyons's home uncovered records of bets and cash disbursements, and a substantial quantity of cash, including $34,318 in a briefcase and $50,000 in the leg of a pair of pants in a drawer.  The Massachusetts State Police continued to investigate Lyons until 2009, when they executed a second search warrant for his house, finding $93,800 hidden above two ceiling tiles and more gambling records.  A federal grand jury indicted Lyons in May, 2010.  A superseding indictment was filed in August, 2010, charging Daniel Eremian, Robert Eremian, Lyons, and Richard Sullivan, another important figure in SOS.  As of March 1, 2012, Robert Eremian and Sullivan were fugitives.

## II.  Analysis

We first address Lyons's and Eremian's common challenges to their convictions, then their individual challenges to their convictions, and finally their challenges to their sentences.

### 1.  The Safe Harbor Provision of the Wire Act

Both Lyons and Eremian were convicted on two counts of violating the Wire Act by transmitting bets or betting information or assisting the transmission of bets over a wire communication facility.  One count charged them with violating the Wire Act using telephones, the other with violating the Wire Act using the internet.  In a challenge directed at both counts, they argue that the district court erred by failing to instruct the jury on the safe harbor provision of the Wire Act, 18 U.S.C. § 1084(b), which exempts from liability certain communications assisting in the transmission of bets between places where betting on sports is legal.

We review preserved claims of instructional error de novo.  United States v. Baird, 712 F.3d 623, 627-28 (1st Cir. 2013).  If this de novo review concludes that "the evidence at trial, taken in the defendant's favor, was sufficient to support his requested instruction, then we move to a three-part test to decide whether the district court's refusal to give the instruction constitutes reversible error."  Id at 628.  Reversal is only appropriate if the requested instruction was "(1) substantively

correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense."  Id.

For the following reasons, we find that Eremian was not entitled to an instruction on the safe harbor provision, and that it makes no difference whether Lyons was entitled to such an instruction.

### a.  Statutory Background

The Wire Act has two provisions relevant to Lyons and Eremian.  Section 1084(a) creates criminal liability:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

Section 1084(b) creates an exception to section 1084(a) applicable to certain transmissions of information assisting in the placing of bets:

> Nothing in this section shall be construed to prevent . . . the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

-8-

Two aspects of this safe harbor provision are pertinent to our analysis in this case. First, the safe harbor provision only applies when gambling on the events in question is legal in both the sending and receiving jurisdiction. Thus, for example, if New York allows betting on horses at race tracks in New York, and if Nevada allows betting in Nevada on the results of New York horse races, then information may be wired from New York to Nevada to assist in the betting in Nevada without violating the statute. See H.R. Rep. No. 87-967, reprinted in 1961 U.S.C.C.A.N. 2631, 2632-33. Second, the safe harbor provision only applies to the transmission of "information assisting in the placing of bets." The safe harbor provision does not exempt from liability the interstate transmission of bets themselves. See United States v. McDonough, 835 F.2d 1103, 1104-05 (5th Cir. 1988); United States v. Bala, 489 F.3d 334, 342 (8th Cir. 2007).

In this manner, the Wire Act prohibits interstate gambling without criminalizing lawful intrastate gambling or prohibiting the transmission of data needed to enable intrastate gambling on events held in other states if gambling in both states on such events is lawful.

**b. Applying Section 1084(b) to Lyons and Eremian**

Lyons and Eremian sought protection under section 1084(b)'s safe harbor provision in two ways: they argued that they were entitled to an acquittal as a matter of law because

all of their charged Wire Act violations fell within the safe harbor provision; and they argued in the alternative that, at the very least, the district court should have instructed the jury on the safe harbor provision because some of their activities fell within it.

Eremian's effort to rely on the safe harbor provision in this manner is a non-starter. Many transmissions he caused were from Florida. He advances no argument that the bets made by SOS bettors in Florida were legal in Florida. Nor could he. See Fla. Stat. § 849.14. Simply put, there was no evidence at all to support his argument that the safe harbor provision could apply to him and therefore no error in denying him an instruction on it. Cf. Baird, 712 F.3d at 627. A fortiori, it follows that the safe harbor did not render insufficient the evidence marshaled against him.

Lyons had a better potential argument regarding the safe harbor because it is not clear that either Massachusetts or Antigua makes sports betting illegal. Both Massachusetts and Antigua law place limits on gambling, but otherwise allow it. Antigua appears to generally allow bets on sporting events, although bets may not be placed on credit. Massachusetts law criminalizes betting by telephone. Mass. Gen. Laws ch. 271, § 17A. It also criminalizes the operation and patronizing of gaming houses, id. at § 5, and the manufacture and sale of gaming devices. Id. at § 5A. The

government, though, points to no Massachusetts law effectively criminalizing betting on sporting events generally. The government nevertheless argues that the bets placed from Massachusetts to Antigua cannot be within the safe harbor provision because they violated the Antiguan gaming regulations. Lyons counters that a bet is "legal" for the purposes of the Wire Act as long as "betting on that sporting event . . . is legal," 18 U.S.C. § 1084(b), in the jurisdiction. Cf. Bala, 489 F.3d at 341-42 (8th Cir. 2007) (holding that non-compliance with statutory requirement that parimutuel betting businesses donate a portion of their proceeds to charity did not mean that betting at those business was "illegal" for purposes of section 1084(b)). But cf. United States v. Cohen, 260 F.3d 68, 73-74 (2d Cir. 2001) (holding that sports betting was "illegal" under section 1084(b) where it was not a crime but was generally prohibited by law and the state constitution).

We need not resolve this dispute. Specifically, in Lyons's case, we need not decide if some of the activity for which he was indicted fell within the safe harbor. Rather, because the evidence was overwhelming that he also engaged in other activity clearly outside the safe harbor, for which he was indicted under the same count, his arguments based on the safe harbor must fail. Where a jury is properly instructed on two theories of guilt, one of which is later determined to be invalid, "we can affirm the conviction only if we conclude 'beyond a reasonable doubt' that

-11-

'the jury verdict would have been the same absent the error.'" United States v. Zhen Zhou Wu, 711 F.3d 1, 30 (1st Cir. 2013) (quoting Neder v. United States, 527 U.S. 1, 17 (1999)). Here, given the overwhelming evidence of Lyons's guilt under an aiding and abetting theory, the district court's refusal to instruct the jury on the safe harbor defense arguably applicable to some of Lyons's acts provides no cause for reversal. A fortiori, his sufficiency argument based on the safe harbor must similarly fail.

The indictment on the two Wire Act counts charged Lyons not just with transmitting information assisting in the placing of bets, but also with aiding and abetting the use of a wire communication facility for the transmission of bets. It alleged that "Eremian . . . Lyons, and others unknown to the grand jury, each aiding and abetting the other, being engaged in the business of betting and wagering, knowingly used a wire communication facility for the transmission in interstate and foreign commerce of bets and wagers . . . on any sporting event or contest." Receiving bets is "use" of a wire communication facility. See Sagansky v. United States, 358 F.2d 195, 200 (1st Cir. 1966). Under 18 U.S.C. § 2(a) "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." Therefore, if Lyons aided and abetted the receipt of bets by SOS he falls outside the protection of the safe harbor provision.

-12-

An aider and abettor is punishable as a principal if, first, someone else actually committed the offense and, second, the aider and abettor "became associated with the endeavor and took part in it, intending to ensure its success." United States v. Spinney, 65 F.3d 231, 235 (1st Cir. 1995). "The central requirement of the second element is 'a showing that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal.'" Id. (quoting United States v. Taylor, 54 F.3d 967, 975 (1st Cir. 1995)). Lyons was not required to know the exact details of each individual transaction to be liable as an aider and abettor--it is sufficient that he knew of SOS's receipt of bets and knowingly helped it continue to receive them. See United States v. Davis, 717 F.3d 28, 33 (1st Cir. 2013) ("[A] culpable aider and abettor need not perform the subject offense, be present when it is performed, or be aware of the details of its execution." (internal quotation marks omitted)); United States v. Hernandez, 218 F.3d 58, 65 (1st Cir. 2000) (knowledge of all details of a drug transaction not needed for aiding and abetting liability).

Any reasonable jury would necessarily have found beyond a reasonable doubt that Lyons aided and abetted SOS's receipt of inter-jurisdictional bets. The core mission of SOS was to engage in the business of interstate gambling on, among other things, sporting events, by causing and receiving the interstate and

-13-

foreign transmission of wagers. It could not do this without receiving bets. Lyons's efforts for over a decade were dedicated to facilitating that business. Lyons handled millions of dollars in proceeds from SOS agents in Massachusetts. He functioned as SOS's "bank" in the state, collecting bettors' losses, distributing winnings, and collecting money from and distributing it to SOS agents. SOS paid him a salary for this role. SOS would have received no bets had it lacked a way to settle up with bettors and so Lyons' role was critical to its receipt of bets.

Like other agents Lyons also aided and abetted the receipt of bets by SOS by functioning as an agent. Witnesses described Lyons as the agent who provided them with the information they needed to place bets with SOS, collected losses from them, and distributed winnings. He also specifically directed at least one bettor to make payments to SOS by wire transfer to settle up bets placed with SOS. Perhaps the best evidence that Lyons intended to ensure SOS's success by these actions, besides the actions themselves, is that he received a commission of 50 percent of the losses of the bettors he personally managed. Lyons was a critical part of SOS's operation and thereby demonstrated a clear intent to further SOS's business of receiving illegal inter-jurisdictional sports bets by phone and over the internet.

Nor could Lyons avoid liability for aiding and abetting the commission of a crime even if he could show that some of the

charged conduct could have been performed lawfully. It is perfectly legal to drive a friend to the bank, but doing so with an intent to help him rob it is a crime. See Spinney, 65 F.3d at 235 (1st Cir. 1995). Similarly, accompanying a friend to a business meeting is not a crime, but doing so with an intent to further the sale of cocaine is. See United States v. Paone, 758 F.2d 774, 776 (1st Cir. 1985). And while working as a crewman on a boat is legal, doing so with an intent to aid its transportation of marijuana is not. See United States v. Cuevas-Esquivel, 905 F.2d 510, 515 (1st Cir. 1990). Many of Lyons's actions, moreover, violated other criminal statutes as the other counts he was convicted of show, and so this is not even a situation in which aiding and abetting liability transforms otherwise purely lawful conduct into criminal action. The two specific payments to SOS Lyons was convicted of causing, for example, formed the basis of Lyons's money laundering conviction we affirm below. Given the clear evidence of Lyons's intent to further SOS's receipt of bets in violation of the Wire Act we therefore have no trouble affirming his conviction on this basis.

### 2. The Internet and the Wire Act

Lyons and Eremian argue for the first time on appeal that they should have been granted an acquittal as a matter of law on the Wire Act count that was based on the transmission of information over the internet because, they claim, the internet is

not a "wire communication facility." They did not raise this specific argument in their post-trial motion for acquittal, in which they objected generally to the sufficiency of the evidence, but also made certain other specific objections. Normally, a general objection to the sufficiency of the evidence preserves all possible sufficiency arguments, but we have also suggested that a defendant who raises only specific sufficiency arguments waives all those he does not make. See United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) (collecting cases for both propositions). We have not decided what happens when a general sufficiency objection is accompanied by specific objections, but we have suggested, albeit in dictum, that such a practice preserves all possible objections because: "[i]t is helpful to the trial judge to have specific concerns explained even where a general motion is made; and to penalize the giving of examples, which might be understood as abandoning all other grounds, discourages defense counsel from doing so and also creates a trap for the unwary defense lawyer." Id. at 135. We need not decide the issue, however, because, whatever the standard of review, the sufficiency challenge fails.

The sufficiency challenge fails because the internet is an "instrumentalit[y] . . . used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and

-16-

reception of such transmission."  18 U.S.C. § 1081; see also United States v. Cohen 260 F.3d 68, 76 (2d Cir. 2001) (transmitting bets over the internet violated the statute because it involved transmission to and from customers of betting information).  Anyone reading this opinion on the court's website or the like would readily agree that the internet is used and useful in the transmission of writings.  Indeed, it is rather remarkable that a definition written before the internet was invented so accurately describes it.  When, as here, the text of a statute "provides  a clear answer" to a question of statutory construction our "inquiry ends." United States v. Robinson, 459 F.3d 39, 51 (1st Cir. 2006). The Wire Act's evident applicability to the internet likewise means that its application to Lyons and Eremian is not, contrary to their claims, an impermissible ex post facto "novel construction of a criminal statute to conduct that . . . the statute . . . has [not] fairly disclosed to be within its scope." United States v. Lanier, 520 U.S. 259, 266 (1997).

        The argument to the contrary relies on two misapprehensions:  First, that the Wire Act cannot be applied to communications over the internet because the Act was enacted in 1961, before the internet was created and, second, that because the internet is in some manner structurally dissimilar to a telephone or telegraph system, the Wire Act cannot apply to it.  On the first point, we regularly apply statutes to technologies that were not in

-17-

place when the statutes were enacted. <u>See,</u> <u>e.g.</u>, <u>Sec. & Exch.</u> <u>Comm'n</u> v. <u>SG Ltd.</u>, 265 F.3d 42, 55 (1st Cir. 2001) (Securities Act of 1933 and Securities Act of 1934 applied to virtual shares which exist only in online game); <u>United States</u> v. <u>Nichols</u>, 820 F.2d 508, 511 (1st Cir. 1987) (theft statute applied to theft of information from computer network). As for the second point, nothing in the statute suggests that any instrumentality covered by the Wire Act must be structurally similar to a telephone exchange.

Nor is it relevant that the internet is not a common carrier, as Lyons and Eremian argue. While section 1084(d) does impose certain requirements on common carriers who are informed their facilities are being used for gambling, nothing in section 1084 or section 1081 limits the application of the Wire Act to transmissions made via common carriers.[2]

_____

[2] Lyons and Eremian also argue that "[r]epeated unsuccessful efforts by the [sic] Congress to amend the Wire Act are further evidence that it does not apply to Internet-gambling of whatever type." Even if unsuccessful attempts to amend a statute decades after it was passed were relevant to our interpretation of that statute, which we doubt, Lyons and Eremian point only to evidence that Congress sought to amend the Wire Act to criminalize forms of gambling other than sports betting. <u>See</u> <u>In re MasterCard Int'l</u> <u>Inc., Internet Gambling Litig.</u>, 132 F. Supp. 2d 468, 480 (E.D. La. 2001) <u>aff'd sub nom</u> <u>In re MasterCard Int'l Inc.</u>, 313 F.3d 257 (5th Cir. 2002). Elsewhere, Lyons and Eremian suggest that the passage of UIGEA suggests that Congress felt that the Wire Act did not apply to the internet either because it felt the need to pass legislation particularly targeting internet gambling or because "Congress could have used this occasion to amend/modernize the Wire Act to specifically include the Internet" but declined to do so. However, Congress made clear when it passed UIGEA that it did not modify existing gambling laws. 31 U.S.C. § 5361(b).

### 3. Mens Rea and the Wire Act

Lyons and Eremian also argue that the government did not prove they had the necessary mens rea to violate the Wire Act. What exactly they say the government failed to prove is unclear. Reading their pleading generously, they appear to argue that even if the internet is a wire communication facility as a matter of law, the government was required to prove that they knew the law. While there are certainly good reasons why Congress might not wish to punish as criminals persons who do not know their conduct may be unlawful, as a general matter ignorance of the law is no defense. See Bryan v. United States, 524 U.S. 184, 193 (1998) ("[U]nless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense." (footnote omitted)); United States v. Cohen, 260 F.3d 68, 76 (2d Cir. 2001) (In proving mens rea under the Wire Act, it "mattered only that [the defendant] knowingly committed the deeds forbidden by § 1084, not that he intended to violate the statute."). Moreover, it is widely known that many forms and means of gambling are regulated or prohibited. Certainly, persons engaged in wide-ranging gambling operations and storing large sums of cash in socks, ceilings, and "six-packs" are not engaged in the types of conduct that would justify applying any exception to the general rule that ignorance of the law is no excuse.

### 4. Extraterritoriality and the Wire Act

Lyons's and Eremian's convictions were not an improper extraterritorial application of the Wire Act. It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." Equal Opportunity Emp't Comm'n v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991) (internal quotation marks omitted), superseded in part by statute, see Arbaugh v. Y&H Corp, 546 U.S. 500, 512 n.8 (2006). The Wire Act expresses such a contrary intent because it explicitly applies to transmissions between the United States and a foreign country. 18 U.S.C. § 1084; cf. Pasquantino v. United States, 544 U.S. 349, 371-72 (2005) (stating that "the wire fraud statute punishes frauds executed in 'interstate or foreign commerce,'" and therefore can be applied extraterritorially because Congress did not have "only 'domestic concerns in mind.'" (quoting 18 U.S.C. § 1343 and Small v. United States, 544 U.S. 385, 388 (2005))). The communications giving rise to these convictions had at least one participant inside the United States and therefore fall within the statute's scope.

### 5. Proof of Sports Betting under the Wire Act

The Wire Act applies only to "wagers on any sporting event or contest," that is, sports betting. 18 U.S.C. 1084(a); see also In re MasterCard Int'l Inc., 313 F.3d 257, 263 (5th Cir.

2002).  Therefore, Lyons and Eremian say, there was insufficient evidence to convict them because some evidence at trial showed that SOS also accepted bets on casino games and other forms of gambling not covered by the Wire Act.  But nothing in the statute limits its reach to entities devoted exclusively to sports betting any more than a bank robber gets off if he also withdraws money properly from an ATM.  The district court instructed the jury that the Wire Act only applied to sports betting.  And there was amply sufficient evidence that Lyons and Eremian, at least, aided and abetted the receipt of sports bets.  SOS was, after all, "Sports Off Shore," not "Slots Off Shore."  It advertised itself as a place to bet on sports, it published odds for sports bets, and its customer-witnesses testified that they placed bets on sports and paid their losses to Lyons and Eremian.

### 6. The Evidentiary Challenge to a Purported Directory of SOS Customers

At trial, Lyons and Eremian unsuccessfully objected to the government's introduction of a directory of SOS customers and agents.  We review preserved evidentiary claims for abuse of discretion.  See United States v. Rivera-Donate, 682 F.3d 120, 131 (1st Cir. 2012).  After initially admitting the directory but reserving judgment on whether it could be admitted for the truth of the matter asserted, the district court later determined that it could be so admitted under Federal Rule of Evidence 801(d)(2)(E), which covers statements of a defendant's coconspirators.

-21-

Statements can only be admitted under Rule 801(d)(2)(E) if the district court finds by a preponderance of the evidence "(1) the existence of a conspiracy, (2) the defendant's membership in that conspiracy, (3) the declarant's membership in the same conspiracy, and (4) that the statement be made in furtherance of the conspiracy." Rivera-Donate, 682 F.3d at 131. The district court made such a finding.[3]

There is more than enough evidence in the record to conclude that the district court did not abuse its discretion by admitting the directory. Each page of the exhibit is titled "agent directory" and has the names and addresses of bettors along with a column labeled "limit" which contains numbers between 0 and 15,000. The directory was turned over to police by government witness Linda Richardson. Richardson testified that she helped her "lover and best friend, mostly best friend" Richard Sullivan, who was named in the indictment but is currently a fugitive, transfer and store money related to SOS. She found the directory within SOS business records Sullivan left in her possession, but testified that she had no prior knowledge that it existed. She recognized at least one

---

[3] Lyons and Eremian claim that the directory was admitted under Federal Rule of Evidence 803(6)(B) but in fact the district court's references to United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), and to finding evidence of a conspiracy show that the court understood the evidence to be introduced under Rule 801(d)(2)(E). Indeed, Petrozziello actually represents a rule for the admission of evidence under Rule 802(d)(2)(E) which is narrower than that currently in effect. See United States v. Goldberg, 105 F.3d 770, 775-76 (1st Cir. 1997).

name on it as someone who had given or received a check to or from Richard Sullivan. The ledger also contained names and addresses for Daniel Eremian and Todd Lyons. Several other witnesses identified names on the list as SOS customers or agents, and some clarified that the agent number on the top of each page represented an SOS agent while the other names on that page were his customers.

Records that can be shown by a preponderance of the evidence to have been made by a member of a conspiracy may be admitted under Rule 801(d)(2)(E) even if their precise author cannot be identified. See, e.g., United States v. De Gudino, 722 F.2d 1351, 1355 (7th Cir. 1983); United States v. Smith, 893 F.2d 1573, 1577-78 (9th Cir. 1990); cf. United States v. Alosa, 14 F.3d 693, 697 (1st Cir. 1994) (records of a conspiracy admissible where "the district court expressly found by a preponderance of the evidence that the ledgers were made by conspirators in furtherance of the conspiracy."). Here, there was strong evidence that the directory was authored by Richard Sullivan or someone else involved with SOS because it contained information that would only have been available to someone in the illegal gambling conspiracy that was SOS and would have only been of use to someone managing SOS agents. And the record well supported the finding that Lyons and Eremian were members of that same conspiracy.

Lyons and Eremian also argue that, even if admission of the directory was correct under the Federal Rules of Evidence, it

nonetheless violated the Sixth Amendment's Confrontation Clause. But they misunderstand the Confrontation Clause, mistakenly believing it confers a general right to cross-examine the source of all evidence introduced at trial. Instead, the Confrontation Clause applies only to testimonial evidence; that is, evidence produced with a "primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011). For this reason, "[b]usiness and public records are generally admissible absent confrontation . . . because--having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial--they are not testimonial." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009). For the same reason, the directory was not testimonial.

### 7. The Lyons Wiretaps

The initial wiretap application targeted a phone used by a member of another gambling operation and was filed on October 12, 2005. After that application was approved, assistant district attorneys filed a series of renewal applications that expanded the initial authorization to include additional telephone numbers, including, on December 8, 2005, Lyons's number. Lyons was recorded both on his own phone and on others' phones. Before trial, Lyons moved to suppress evidence derived from all of these wiretaps.

-24-

While Lyons's brief conflates several distinct legal issues in its discussion of the wiretaps, he essentially makes three arguments: First, that the district court's decision that gambling is legal in Massachusetts means the wiretap applications were not supported by probable cause and the evidence derived from them should therefore be suppressed. Second, that the wiretaps were not authorized by the Essex County District Attorney and therefore were granted in violation of federal law and should be suppressed or at least should have been subject to challenge in an evidentiary hearing. Third, that even if the wiretaps were in fact authorized they should be suppressed because the initial wiretap application did not facially demonstrate that it was properly authorized. We address these arguments in turn.

**a. Probable Cause for the Wiretaps**

Lyons argues for the first time on appeal that the police lacked probable cause for the wiretaps. "A party waives [a suppression argument under rule 12(c)] . . . not raised by the deadline the court sets." Fed. R. Crim. P. 12(e). Here, Lyons did not raise this argument at all below. While "[f]or good cause, the court may grant relief from the waiver," id., Lyons has not addressed the waiver issue at all, let alone explained why he has good cause to seek relief from it. Despite Rule 12's clarity, we have suggested in the past that we may sometimes nonetheless review unpreserved suppression claims for plain error. See United States

v. <u>Nuñez</u>, 19 F.3d 719, 723 n.10 (1st Cir. 1994) (noting that some courts have conducted plain error review of claims waived under what was then Rule 12(f) and is now Rule 12(e), but also that this is not necessarily required).  More recently, however, we have emphasized the categorical language of Rule 12(e) and made clear that it is "'manifestly unfair'" to the prosecution to allow the defendant to raise on appeal a suppression claim that was not raised below, even if suppression of the same evidence was sought on other grounds.  <u>United States</u> v. <u>Crooker</u>, 688 F.3d 1, 9 (1st Cir. 2012) (quoting <u>United States</u> v. <u>Walker</u>, 665 F.3d 212, 228 (1st Cir. 2011)).  We see no reason to find that manifest unfairness absent here.

### b.  **Authorization of the Wiretaps**

Lyons did timely raise in the district court his other two challenges to the wiretaps.  The standard of review for preserved suppression arguments can be somewhat confusing because such motions interweave questions of fact and law:

> When reviewing a challenge to a district court's decision on a suppression motion, we review the district court's factual findings and credibility determinations only for clear error. <u>United States</u> v. <u>Camacho</u>, 661 F.3d 718, 723 (1st Cir. 2011); <u>see</u> <u>Ornelas</u> [v. <u>United States</u>, 517 U.S. [690,] 699 . . . [(1996)] (findings of historical fact reviewed for clear error).  We review the court's legal conclusions de novo. <u>United States</u> v. <u>Rabbia</u>, 699 F.3d 85, 89 (1st Cir. 2012).  That being said, it is also true that we 'give due weight to inferences drawn from historical facts by resident judges and local law enforcement officers.' <u>Ornelas</u>, 517 U.S. at 699 . . . . As explained in <u>United States</u> v. <u>Townsend</u>, 305 F.3d 537 (6th Cir. 2002), the district court, which observes the

testimony of the witnesses and understands local conditions, is at an institutional advantage in making this determination. Id. at 542. "Accordingly, 'due weight' should be given to the inferences drawn from the facts by 'resident judges.'" Id. (quoting Ornelas, 517 U.S. at 698).

United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013).

Lyons's first preserved argument is that the wiretap applications were not reviewed by the Essex County District Attorney and are therefore invalid. Lyons is correct that a wiretap sought by state law enforcement must be authorized by the principal prosecuting attorney for the jurisdiction--either the state attorney general or the county district attorney, in this case the Essex County District Attorney. 18 U.S.C. § 2516(2). Under Massachusetts law, the principal prosecuting attorney need not himself appear in court in support of every wiretap application. Instead, he may specially designate a subordinate to exercise his authority on a case by case basis, but only in writing and after he has personally reviewed the wiretap application. Mass. Gen. Laws. ch. 272, § 99(F)(1); see also United States v. Smith, 726 F.2d 852, 857-58 (1st Cir. 1984) (citing Commonwealth v. Vitello, 367 Mass. 224 (1975)).

The Essex County District Attorney, Jonathan Blodgett, signed letters authorizing two assistant district attorneys to file

the first wiretap application at issue here.[4]   One letter was addressed to the state justice receiving the application and the other was addressed to the assistant district attorneys being specially designated.   In addition to authorizing the assistant district attorneys to file the applications, the letter to the state justice explained that "all of [the wiretap applications] shall be reviewed by me or my designee before being presented to you."

Standing on its own, this letter might be insufficient because Massachusetts requires that the district attorney personally review the application--a designee is insufficient. Vitello, 367 Mass. at 231-32.  However, in an initial ruling on the suppression motion, the district court determined that "[t]he fact that the designation letter, the letter to [the state justice], and the warrant application were all dated October 12 supports the reasonable inference that they were all presented together and that D.A. Blodgett was familiar with the contents of the application." This inference was not clearly erroneous.   The district court therefore properly denied the suppression motion as to the phone numbers listed in the October 12th application.

---

[4]  The actual warrant applications are not part of the record on appeal or available on the district court docket.   There is no dispute, however, that the initial wiretap at issue was sought by the assistant district attorneys designated by District Attorney Blodgett and so nothing in the wiretap applications is relevant to the issue before us.

Because the district court was uncertain whether Massachusetts law required re-designation and personal review by the district attorney when new numbers were added to an existing wiretap, it ordered District Attorney Blodgett to file "an affidavit regarding his authorization of the particular amendments at issue . . . ." District Attorney Blodgett filed such an affidavit in which he made clear that he "personally reviewed each and every renewal application" prior to its submission and that he intended the specially designated assistant district attorneys to oversee the entire investigation, including both the original wiretaps and the "renewals." The affidavit also stated that, as the district court inferred in its initial ruling, District Attorney Blodgett did in fact personally authorize the October 12th wiretap application. The district court therefore denied the suppression motion as to the remaining wiretaps.

We have previously held that, in combination with letters substantially equivalent to the ones that accompanied the initial application in this case, an affidavit like that submitted by District Attorney Blodgett is sufficient to establish actual authorization. United States v. Albertelli, 687 F.3d 439, 443 (1st Cir. 2012). We therefore have no reason to question the district court's factual finding that each wiretap application was specifically and personally authorized by District Attorney Blodgett as Massachusetts and federal law require. The district

court also did not err by failing to hold an evidentiary hearing because the court inquired into the particular circumstances and "the only material dispute was not about what happened but whether the district attorney's version of what he did was sufficient oversight." Id. Certainly Lyons points to no evidence he could have sought to introduce or discover at an evidentiary hearing which could have contradicted District Attorney Blodgett's version of events. Nor does he point even to a question he might have asked Blodgett. We therefore face similar facts as in Albertelli and so reach the same result--the wiretap was properly authorized.[5]

### c. Facial Sufficiency of the Wiretap Application

Lyons also argues that the wiretap evidence should be suppressed because, even if the warrant was properly authorized, it did not make clear on its face that it had been reviewed by District Attorney Blodgett. This argument conflates two separate sections of the federal law governing wiretaps, Title 18, sections 2516 and 2518. Section 2516 sets out the substantive requirements for the authorization of a wiretap, including the requirement of review by the principal prosecuting attorney, while section 2518 sets out the procedure by which wiretaps can be requested. Nothing

---

[5] Lyons also suggests that he had a right to confront District Attorney Blodgett. Again, he misunderstands the Confrontation Clause. See United States v. Mitchell-Hunter, 663 F.3d 45, 51-52 (1st Cir. 2011) (collecting "extensive case law declining to apply the confrontation right to various pre- and post-trial proceedings").

in section 2518 requires that a wiretap application itself contain proof that it has been reviewed by the principal prosecuting attorney. United States v. Vento, 533 F.2d 838, 859-60 (3d Cir. 1976) (Authorization letter did not need not be shown to the issuing judge.); see also United State v. Chavez, 416 U.S. 562, 575 (1974) (Evidence derived from a wiretap did not need to be suppressed where "misidentification of the officer authorizing the wiretap application [in the application] did not affect the fulfillment of any of the reviewing or approval functions required by Congress."). Instead, the application must only state "the applicant's authority to make such application." 18 U.S.C. § 2518(1).[6]

The designation letter made clear that District Attorney Blodgett authorized the application. Our conclusion that proof of review by the district attorney is not required on the face of the application also follows from United States v. Smith, 726 F.2d 852, 860 (1st Cir. 1984), in which we recognized that failure to include proof of authorization in the application could be remedied by subsequently produced evidence of authorization.

---

[6] The distinction between the identity of the authorizing official, which must be present on the face of the application, and proof of authorization, which need not be included, is critical. Lyons mistakenly relies on United States v. Staffeldt, 451 F.3d 578, 584-85 (9th Cir. 2006), which holds that, in some cases, failure to provide the former on the face of the application is grounds for suppression. Here, however, the issue is the absence of the latter.

## 8.   The Lyons Searches

In addition to the wiretaps, Lyons argues that the district court erred by denying his motion to suppress evidence obtained from the 2006 searches of his home, car, and person pursuant to warrants.  First, Lyons argues that there was not probable cause for the search of his home.  Second, he argues that the state justice's failure to sign the final page of each warrant means that the searches violated the Fourth Amendment of the United States Constitution.  We reject both arguments and affirm the district court's denial of Lyons's motion to suppress.

### a.   Probable Cause For the Searches

Lyons challenges the warrants to search his home, car, and person using the same argument he first made about the wiretaps: that the subsequent decision by the district court that internet gambling is legal in Massachusetts means there was not probable cause to suspect him of a crime.  He has again waived that argument by failing to raise it below and we therefore reject it without further discussion for the reasons stated above.

Lyons also brings a properly preserved challenge to the search of his home, arguing that there was no nexus between the evidence sought in the search warrant and his home.  A valid warrant application must establish that there is probable cause to believe that the evidence described in it will be found in the place to be searched. United States v. Feliz, 182 F.3d 82, 86 (1st

Cir. 1999).  The government need not show, however, that "the belief [is] . . . necessarily correct or more likely true than false."  Id. at 87 (citing Spinelli v. United States, 393 U.S. 410, 419 (1969)).  Instead, "[o]ur inquiry is whether the magistrate had a 'substantial basis' for concluding that probable cause existed."  Id. at 86 (quoting  United States v. Taylor, 985 F.2d 3, 5 (1st Cir. 1993)).

The trooper's affidavit submitted in support of the warrant application for Lyons's home contained sufficient evidence of a nexus between the evidence it sought and Lyons's home.  The trooper stated under oath that "Lyons would go directly to his residence when he had completed his meets [with bettors.]"[7]  He also stated that "[b]ased on my training and experience and coupled with the intercepted conversations that I have reviewed regarding Todd Lyons, it is my opinion that Todd Lyons uses his residence as a place where he stores gaming records and money."  We have previously held that the nexus requirement was met by weaker evidence.  See, e.g., United States v. Ribeiro, 397 F.3d 43, 50 (1st Cir. 2005) (holding that direct trips between home and sites of drug deals and defendant's need to store large quantities of cash sufficient to demonstrate nexus); United States v. Barnes, 492

_____

[7]  Lyons is correct that the affidavit does not describe these incidents with particularity, but provides no reason to believe the trooper's statement inaccurately describes what he and other troopers observed.

-33-

F.3d 33, 37 (1st Cir. 2007) (holding that "when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home"); Feliz, 182 F.3d at 88 (collecting cases).  We therefore find that the warrant was supported by probable cause.

### b.  The Unsigned Warrants

Absent exceptions not present here, police may not search a person's home without a warrant.[8]  See, e.g., Kentucky v. King, 131 S. Ct. 1849, 1856 (2011).  The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  The police seeking to search Lyons's home completed a written application to search it and swore in support of that application.  The application recited facts establishing probable cause.  The state judge reviewed the application, determined that probable cause existed, signed the application, and signed the accompanying affidavit.  The warrant described particularly the place to be searched, and the persons or things to be seized.

---

[8]    Because the evidence Lyons seeks to suppress was, it appears from the record, found in his home, not his car or on his person, we discuss only the warrant for the search of his home. Our analysis would apply equally, however, to all three warrants.

The judge, however, unintentionally forgot to sign the warrant itself before the officers conducted the search. The following day, after the search was complete, state law enforcement officials noticed the omission. The prosecutor promptly returned that day to the same judge, who belatedly signed the warrant, at the same time writing a note explaining that his failure to sign previously "was inadvertent and of no substantive consequence."

Lyons speculates that the state judge in fact never saw or approved the warrant until he later signed it, but the evidence amply supports the district court's factual finding to the contrary. Cf. United States v. Dubose, 579 F.3d 117, 120 (1st Cir. 2009) (findings of fact on motions to suppress reviewed for clear error). Lyons alternatively claims that the record is defective (and an evidentiary hearing was therefore required) because it does not show "exactly" when, during the one-day interlude between issuance and signing, the Commonwealth noticed the error, or exactly how the judge was approached to correct the error. The simple answer to this assertion is that the "missing" facts are plainly immaterial to whether the warrant application was properly reviewed and whether the state court judge issued the warrant.

Lyons argues, finally, that the warrant was invalid precisely because it was not signed until after the search. This court has not previously ruled on whether a signature is required for a search warrant. But we see nothing in the Fourth Amendment

that conditions the validity of a warrant on its being signed. Similarly, while Federal Rule of Criminal Procedure 4(b)(1)(D) explicitly states that arrest warrants must be signed (as does Mass. R. Crim. P. 6(b)(1)), neither federal nor state rules of criminal procedure governing search warrants contain such a requirement.[9]  See Fed. R. Crim. P. 41(e)(1); Mass. Gen. Laws ch. 276, § 1.  Certainly that which the Fourth Amendment requires must appear on the warrant (a particular description of the "place to be searched" and "persons or things to be seized").  And a warrant does not issue unless it has been supported by an oath or affirmation and a neutral and detached magistrate makes a probable cause determination.  See, e.g., King, 131 S. Ct. at 1864.  But we see no convincing reason to find implicit in the Fourth Amendment a constitutional mandate that the magistrate who has made a probable cause determination also sign the warrant.

Our related precedent, while not directly on point, supports the conclusion that a signature is not required.  In Burke v. Town of Walpole, 405 F.3d 66, 78 (1st Cir. 2005), we ruled that the police's inability to locate a signed copy of an arrest warrant

---

[9]  The Massachusetts Supreme Judicial Court has held that signatures are not required for a search warrant to be validly issued.  Commonwealth v. Pellegrini, 405 Mass. 86, 90 (1989).  Though compliance with state law is neither necessary nor sufficient for evidence's admission in federal court, see, e.g., United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000), we mention Massachusetts law here to underline that our conclusion is consistent with that of other courts.

did not preclude the state from proving with "imperfect[] evidence" that the warrant had in fact been issued. <u>See also</u> <u>United States</u> v. <u>Pratt</u>, 438 F.3d 1264, 1270 (11th Cir. 2006) (Where a search warrant is lost after the search it authorizes is conducted and therefore "is not in evidence at a suppression hearing," suppression is not necessary if "a prosecutor [can] prove, by a preponderance of the evidence, the missing search warrant's <u>exact</u> language describing the place to be searched and the persons or items to be seized."). If issuance of an arrest warrant can be established without a signed copy of the warrant, we see no reason why signing is necessary to prove issuance of a search warrant.

Our conclusion is strengthened by the consistent rejection of formalistic approaches to signatures in warrants by federal appellate courts in other contexts. Like other circuits, we have rejected the position that the copy of the warrant presented to a homeowner must bear a signature. <u>See</u> <u>Sadlowski</u> v. <u>Benoit</u>, 62 F. App'x 3, 5 (1st Cir. 2003) (unpublished) (per curiam); <u>accord</u> <u>United States</u> v. <u>Beals</u>, 698 F.3d 248, 264–65 (6th Cir. 2012) (holding that warrant was "not any less 'issued'" where judge signed only one copy and unsigned copy was presented to the defendant); <u>United States</u> v. <u>Lipford</u>, 203 F.3d 259, 270 (4th Cir. 2000) (failure to present signed copy of a search warrant to the person whose home is searched is "at most, a technical violation of

-37-

Federal Rule of Criminal Procedure 41(d), and not a violation of the Fourth Amendment.").

The Second Circuit has gone further, noting that "the Fourth Amendment requires that . . . the judgmental function of drawing inferences from evidence and deciding whether probable cause exists be made by a neutral and detached magistrate," but that "nothing in the Fourth Amendment prevent[s a] magistrate from delegating" the "purely ministerial task" of signing the warrant to someone else. United States v. Turner, 558 F.2d 46, 50 (2d Cir. 1977) (approving a warrant application and issuance made entirely by telephone). The Eighth Circuit has held that Title III (the wiretap statute codified at 18 U.S.C. §§ 2510-2520), which is silent on whether wiretap orders must be signed, does not require a signature where "[t]he record reveals compliance with all the fundamental statutory safeguards that protect against unauthorized or unwarranted wiretap surveillance." United States v. Moore, 41 F.3d 370, 375 (8th Cir. 1994); see also United States v. Johnson, CRIM. 08-374, 2012 WL 2370434 (W.D. Pa. June 21, 2012) (same). But see United States v. Moore, 4:CR93-3035, 1993 WL 764485 (D. Neb. Dec. 28, 1993) (suppressing wiretap conducted under unsigned wiretap order where judge who failed to sign the order testified that he intended to sign it but could not recall what, if anything, he said to the requesting officers at the time). And in the context of arrest warrants, the Seventh Circuit has observed that

"[i]ssuing a warrant is not synonymous with signing a warrant" because while Federal Rule of Criminal Procedure 4(b)(1)(D) requires a judge's signature for arrest warrants issued pursuant to a criminal complaint, Rule 9 states that warrants for a defendant named in an indictment must still be issued by a judge but may be signed by a clerk of the court. United States v. Hondras, 296 F.3d 601, 603 (7th Cir. 2002); see also ISSUE, Black's Law Dictionary 908 (9th ed. 2009) (defining "issue" as "[t]o send out or distribute officially"). Certainly our own opinions and mandates are "issued" notwithstanding the absence of a signature.

Though none of these cases from other circuits address the precise question before us,[10] taken together they show a consistent unwillingness to find a constitutional violation when

---

[10] The majority of the few district court opinions on point reject the position that a warrant must be signed to be validly issued. See United States v. Jackson, 617 F. Supp. 2d 316, 320-21 (M.D. Pa. 2008) (holding that an unsigned warrant is valid if supported by sufficient "indicia of issuance"); United States v. Martin, 8:10-CR-305-T-33AEP, 2011 WL 722969, at *4 (M.D. Fla. Feb. 7, 2011) (holding that "the Court's sole inquiry should be to determine whether the search warrant was reviewed and issued by an appropriate judicial authority upon an examination of all relevant and credible evidence"); Perrin v. City of Elberton, GA, 3:03-CV-106(CDL), 2005 WL 1563530 (M.D. Ga. July 1, 2005) (holding that "in the absence of a judge's signature, a court may consider other evidence that the judge found probable cause and approved the warrant" but concluding there was insufficient evidence of such issuance); Johnson v. Kosciusko Police Dep't, 1:09CV169-M-S, 2010 WL 1237934 (N.D. Miss. Mar. 25, 2010) (holding the same in a section 1983 case). But see United States v. Evans, 469 F. Supp. 2d 893, 897-99 (D. Mont. 2007) (rejecting argument that a warrant could be said to have issued where judge "may well have" intended to sign it but failed to do so).

the express mandates of both constitution and rule have been satisfied. Given the clear and contemporaneous evidence that the state justice made a proper probable cause determination and approved the issuance of a warrant for execution, we decline to find in the lack of a signature a reason for suppression.

We do, though, add a note of caution: The presence of a signature provides easy and reliable proof that a warrant was in fact issued. An officer who observes that a warrant is unsigned might not be assured that it was actually issued, and might execute it at his peril if he has no other good reason to believe the warrant was issued. And when, as here, the warrant is not signed, proof of issuance becomes more involved and less certain. In many circumstances, the magistrate or judge may not recall reviewing or issuing the warrant by the time his belated signature is sought. For these reasons, we are confident that police will continue to have ample incentive to secure signatures. In any event, we find no sufficient reason to read a signature requirement into the Fourth Amendment, and we leave to any future revisers of Federal Rule of Criminal Procedure 41(e) whether to adopt such a presently-omitted requirement for search warrants.

### 9. Lyons's Money Laundering Conviction

Lyons challenges the sufficiency of the evidence for his conviction on two counts of money laundering under 18 U.S.C. § 1957, arguing that the statute applies only to the transmission

of profits from illegal activity, not to the transmission of gross receipts, and that the government failed to prove he transmitted profits.[11]  We have discussed Lyons's preservation of his sufficiency claims and the standard of review for such claims above.  We repeat that we view Lyons's arguments as likely preserved by his general motion.  Again, though, we need not formally resolve the preservation issue because, even reviewing the challenge de novo, interpreting the evidence in the light most favorable to the verdict, Lyons's argument fails.

Section 1957(a) provides (and provided in 2006 when the transmissions at issue here were made) that "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000" violates the law if the funds are "derived from specified unlawful activity."  "Specified unlawful activity" is defined as a violation of any of the statutes or types of statutes listed in 18 U.S.C. § 1956(c)(7).  "'Criminally derived property'" is "any property

---

[11]  Lyons's brief includes some discussion of the district court's instructions to the jury on this subject and his objection to them.  The court's instructions, however, would be relevant only if Lyons were seeking a new trial rather than a reversal of the district court's denial of his Rule 29 motion and he has chosen not to do so.  Lyons's statement of the issues, argument summary, and the portion of his brief dealing with this count all make clear that he has chosen to only challenge the sufficiency of the evidence.  If this had simply been a case of unclear drafting, Lyons presumably would have explained in his reply brief that he intended to argue instructional error as well as sufficiency of the evidence.  But he did not, even after the government, in its brief, pointed out the limited scope of his appeal.

constituting, or derived from, proceeds obtained from a criminal offense."  18 U.S.C. § 1957(f)(2).  Until a definition of "proceeds" was added to section 1956 in 2009, the term was undefined.  See Fraud Enforcement and Recovery Act of 2009, Pub L. No. 111-21 § 2, 123 Stat. 1617.  The 2009 amendment was a response to United States v. Santos, 553 U.S. 507 (2008), which interpreted the word "proceeds" in a closely related statute, 18 U.S.C. § 1956, to refer only to the profits from illegal activity, rather than gross receipts.  The government does not dispute that the word "proceeds" meant "profits" in section 1957 as well as section 1956 prior to 2009.

Santos further explained, however, that to prove a defendant transmitted "profits . . . the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction."  Id. at 520.  If the underlying crime can be accomplished through a single transaction then the prosecution need not show that the profits from that particular act were not offset by losses elsewhere in the criminal conspiracy, but must instead only show that the particular transaction charged consisted of at least $10,000 in profits.  Id.  Lyons does not dispute that 18 U.S.C. § 1957, which criminalizes "a monetary transaction" that meets certain criteria, can be violated by a single act.  There was therefore no need for the government to prove that SOS as a whole

-42-

was profitable in order to convict Lyons under that statute. All the government needed to prove was that the proceeds of the particular transactions charged in the indictment were "profits" of "specified unlawful activity." Santos, 553 U.S. at 520 n.7.

There was sufficient evidence for such a finding. Lyons was acquitted of money laundering on all but two counts, each of which was based on transfers from Lyons's customer Thomas Belekewicz. The indictment describes the underlying crime simply as "unlawful gambling activity" without specifying a particular statute (besides section 1957) that the transfers violated. However, the previous section of the indictment, charging money laundering under section 1956, specifies that the underlying crime of "illegal gambling activity" was a violation of 18 U.S.C. § 1955 (the same statute at issue in Santos), which criminalizes operation of an illegal gambling business, and 18 U.S.C. § 1084, the Wire Act. Violations of both statutes are "specified unlawful activity" as that term is defined under 18 U.S.C. § 1957(f)(3) because they are offenses listed in 18 U.S.C. § 1961(1), and therefore fit the definition of unlawful gambling activity by 18 U.S.C. § 1956(c)(7)(A).

Belekewicz testified that he and his business partner Ed Doherty placed bets on sporting events using the telephone or internet. By receiving such bets, SOS violated the Wire Act. 18 U.S.C. § 1084(a). On November 17, 2005, following Lyons's

-43-

instructions, Belekewicz attempted to transfer $20,381 to Benevolence Funding, a company controlled by Robert Eremian. This transfer constituted SOS's profits from its violation of the Wire Act by receiving bets from Belekewicz and Dohertry because the transfer represented the difference between Belekewicz's winnings and losses over those bets. Similarly, an $86,656 transfer (also made per Lyons's instructions) was "the accumulation of a few weeks" of Belekewicz's losses and so constituted SOS profits. There was therefore sufficient evidence for a reasonable jury to convict Lyons on each money laundering count because the evidence was sufficient to show that, on both occasions, Lyons caused the transmission or attempted transmission of at least $10,000 in profits from unlawful activity. The fact that Lyons or SOS may have lost money on other bets does not insulate Lyons from liability for these charged bets.

### 10. Lyons's Travel Act Convictions

Lyons challenges the sufficiency of the evidence for his conviction on four counts of violating the Travel Act, 18 U.S.C. § 1952, on the same grounds upon which he challenged his money laundering convictions. Lyons was convicted of four counts of "travel[ling] in interstate or foreign commerce or us[ing] the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds of . . . any business enterprise involving gambling." 18 U.S.C. § 1952(a), (b). The indictment

charged four specific instances in 2005 in which Lyons sent money to Antigua via FedEx. Lyons argues that there was no evidence these transactions constituted profits. It is undisputed, though, that SOS agents collected losses from bettors, paid out winnings, deducted their commission, and only then remitted the remainder to SOS. Lyons functioned as a bank for SOS in Massachusetts, collecting these profits from SOS agents and paying out extra money to agents who needed it to cover large winnings. A reasonable jury could easily have concluded, therefore, that the money he sent to SOS in Antigua constituted proceeds of the SOS operation in Massachusetts even if we assume that the term "proceeds" under the Travel Act means "profits."

### 11. Lyons's UIGEA Convictions

Lyons also challenges his convictions on ten counts of violating the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361-67. Lyons argues that it was impossible to violate the statute until certain regulations implementing it were passed. See Prohibition on Funding of Unlawful Internet Gambling, 73 F.R. 69382-01 (Nov. 18, 2008). These regulations clarify liability for financial institutions under the law. See 31 C.F.R. § 132.2. As applied to this case not involving a charge against a financial institution, UIGEA was adequately clear before these regulations were passed. The statute prohibits the knowing acceptance of certain financial instruments "in connection with the participation

-45-

of another person in unlawful Internet gambling."  31 U.S.C. §
5363.  "Unlawful Internet gambling," in turn, is defined as "to
place, receive, or otherwise knowingly transmit a bet or wager by
any means which involves . . . the Internet where such bet or wager
is unlawful under any applicable Federal or State law . . . ."  31
U.S.C. § 5362(10)(A).  It is, as we have already noted, illegal to
transmit or receive a sports bet in interstate commerce under the
Wire Act even if placing the bet is legal at both ends of the
transmission.  18 U.S.C. § 1084(a).  The Wire Act is a federal law,
and therefore transmitting or receiving bets is "unlawful gambling"
as that term is defined in UIGEA.  The final implementing
regulations for UIGEA do not alter this analysis.  It was therefore
possible to violate the statute before the implementing regulations
were passed.  Nor was the statute so vague on its face that its
enforcement was unconstitutional.  See Interactive Media Entm't &
Gaming Ass'n Inc. v. Atty. Gen. of U.S., 580 F.3d 113, 115-117 (3d
Cir. 2009) (explaining in more detail why UIGEA survives such a
facial challenge).  We therefore affirm Lyons's UIGEA convictions.

         **12.   The Prosecutor's Purported Reference to Lyons's**
                 **Silence**

         Lyons presses his argument, first made at trial, that the
prosecutor improperly referred before the jury to Lyons's decision
not to testify, violating his Fifth Amendment right against self-
incrimination.   The government agrees that our review of this
objection is de novo.   The applicable test we apply is well

-46-

established.  See United States v. Rodriguez-Velez, 597 F.3d 32, 44 (1st Cir. 2010).  "A comment on the defendant's failure to testify . . . infringes the defendant's Fifth Amendment rights whenever 'the language used [by the prosecutor is] manifestly intended or [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  Id. (quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987)).

Lyons's counsel argued at trial that Lyons "didn't think that he was doing anything wrong," supporting this argument with various examples of actions he said Lyons would not have taken if he had believed he was acting illegally.  In closing, the prosecutor responded as follows:

> Now there's been a lot of talk about, what did the defendants know? What did they intend? What did they believe? And [Lyons's counsel] wants to get up here and tell you what Todd Lyons thought. Now, I want you to check your notes, check the record, and see if there is any evidence before you about what Todd Lyons thought, or if there's any evidence from any witness about conversations between them and Todd Lyons where Todd Lyons expressed his opinion about the legality of Sports Off Shore. I suggest to you there is no evidence at all.

The prosecutor went on to suggest that the jury should infer Lyons's mental state from his actions.  After the closing argument, Lyons's counsel objected to this statement and the district court offered to give a curative instruction.  Lyons's counsel indicated that he did not want to "highlight it right now" but did request

and received an instruction on the Fifth Amendment when other jury instructions were given.

We have made clear that "[w]here the defendant has presented a defense . . . the government is permitted to discuss competing inferences from the evidence on the record." United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009). Similarly, the prosecution may comment on the lack of evidence for a defense theory. United States v. Wilkerson, 411 F.3d 1, 8 (1st Cir. 2005) (prosecutor did not violate the Fifth Amendment "when he said 'there's no real evidence' that [defendant] did not go up the alley and 'pretty much nothing' to say that [he] ran up the driveway"). The government commented on the lack of evidence to support a defense theory, not on Lyons's failure to testify. And the possibility that jurors may have inferred, from the comment actually made, a comment not actually made arises from the very nature of the defense raised, not from any uninvited effort by the government to carry its burden. We affirm the district court's ruling on this issue as well.

### 13. Venue in Massachusetts for Eremian

Shortly before trial, Eremian's counsel requested an instruction on venue. When the district court made clear it could not rule on the request without further briefing, he promised to provide it by the end of the day, adding that "[i]f I don't file it by 5:00 . . . today, it means I'm not requesting it." He did not

file any further briefing and therefore knowingly waived the issue, precluding any appellate review.  See Fed. R. Crim. Pro. 12(e); United States v. Walker, 665 F.3d 212, 228 (1st Cir. 2011) ("[A] party's failure to raise Rule 12(b)(3) defenses prior to trial," including venue, "constitutes a waiver in the classic sense and, thus, precludes appellate review of the defaulted challenge.").

### 14.  Eremian's RICO Conspiracy Conviction

Eremian was convicted on one count of racketeering conspiracy and one count of racketeering, only the latter of which he challenges.  The prosecution may prove racketeering through, among other things, proof of collection of an unlawful debt.  18 U.S.C. § 1962(c).  The indictment listed by name four people from whom Eremian purportedly collected an unlawful debt.  Each testified at trial that he lived in Florida and paid money to Eremian to settle gambling debts.

A debt is "unlawful" under § 1962(c) if it is "(A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, . . . and (B) . . . was incurred in connection with the business of gambling in violation of the law of the United States." 18 U.S.C. § 1961(6).  We have already noted that the bets placed by SOS bettors were illegal under both federal and Florida law and such bets were incurred "in connection with the business of gambling."  There was therefore more than sufficient evidence to

-49-

convict Eremian of collecting an illegal debt and, hence, of racketeering.

### 15. Adequacy of the Indictment

Eremian also argues that instructing the jury on Florida law to help it determine whether the debts he collected were unlawful constituted a constructive amendment of the indictment because the indictment did not specifically mention Florida law. The indictment was clear that Eremian lived in Florida and conducted his business for SOS there and that he was accused of collecting an unlawful debt from specific people who testified that they interacted with him in Florida. The indictment cited 18 U.S.C. § 1961(6), which defines an unlawful debt as "a debt . . . incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof." The indictment also described these debts as those "incurred in connection with the business of gambling in violation of the laws of the United States and the law of the Commonwealth of Massachusetts."

Though Florida, unlike Massachusetts, was not explicitly mentioned in the indictment, Eremian knew he was being charged with collecting a debt, unlawful under state or federal law, while residing in Florida. He was therefore on notice that Florida law would likely be at issue. See United States v. Vega Molina, 407 F.3d 511, 525 (1st Cir. 2005) ("[E]rroneous statutory citations in

an indictment do not constitute grounds for reversing a conviction, as long as the defendant was on fair notice of the charges against him."); United States v. Celestin, 612 F.3d 14, 24-25 (1st Cir. 2010) (no constructive amendment where defendant had "notice of the various theories of liability on which he could be convicted"); United States v. Hernández, 490 F.3d 81, 84 (1st Cir. 2007) (same).

### 16.  Sentencing and Forfeiture

Lyons was sentenced to 48 months in prison while Eremian was sentenced to 36 months.  Lyons and Eremian do not dispute that their sentences were within the range proscribed by the United States Sentencing Guidelines or that the guideline ranges for their convictions were properly calculated.  Lyons and Eremian are less clear on what they are challenging, but they reference both the Eighth Amendment and the reasonableness of their sentences under the guidelines and so we will treat them as appealing their sentences on both bases.

A sentence violates the Eighth Amendment's prohibition of "cruel and unusual punishment if it is 'grossly disproportionate to the underlying offense.'"  United States v. Raymond, 697 F.3d 32, 40 (1st Cir. 2012) (quoting United States v. Polk, 546 F.3d 74,76 (1st Cir. 2008)).  If, after comparing the "'gravity of the offense and the harshness of the penalty'" we conclude there is no "gross disproportionality . . . the inquiry ends there."  Raymond, 697 F.3d at 40 (quoting Solem, 463 U.S. at 290-91).  That is the case

here--Lyons and Eremian were key players in multi-million-dollar gambling operation that lasted for more than a decade.  Like "most efforts to demonstrate gross disproportionality[, this one] fail[s]." United States v. Polk, 546 F.3d 74, 77 (1st Cir. 2008). Lyons's and Eremian's challenges to the reasonableness of their sentences under the guidelines fail as well.  We review the reasonableness of sentences for abuse of discretion. United States v. Tavares, 705 F.3d 4, 24 (1st Cir. 2013).  "[A] defendant who protests his within-the-range sentence on this ground must adduce fairly powerful mitigating reasons and persuade us that the district court was unreasonable in balancing pros and cons." United States v. Medina-Villegas, 700 F.3d 580, 584 (1st Cir. 2012) (internal quotation marks omitted).  Lyons and Eremian have even more trouble meeting this burden because their sentence was "within a properly calculated [guideline sentencing range.]" Id. Lyons's and Eremian's sentences were procedurally reasonable because the district court understood the guidelines to be discretionary and properly considered the relevant factors under 18 U.S.C. 3553(a). Lyons and Eremian nonetheless argue that their sentences are substantively unreasonable for two main reasons.

First they argue their sentences are unreasonable because they exceed those of other SOS conspirators who were not charged or did not spend time in jail.  The district court found that Lyons's and Eremian's roles were more central to SOS than those of others

who were not charged (except, presumably, for Richard Sullivan and Robert Eremian who are fugitives).  Moreover, many of the other SOS agents cooperated with the government's investigation and therefore are not directly comparable to Lyons and Eremian for sentencing purposes.  United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005) ("[I]t would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities and then cry foul when a coconspirator benefits from rendering substantial assistance to the government.").

Second, Lyons and Eremian argue that their sentences are unreasonable because they exceed the maximum sentences for their Wire Act convictions and the guideline range for federal statutes specifically criminalizing the operation of a gambling business.  The government agrees that "RICO and RICO conspiracy convictions largely drove the offense level calculation."  But there is nothing unreasonable about sentencing Lyons and Eremian for violating RICO when they were actually convicted of violating RICO.  A court could perhaps have considered Lyons and  Eremian's argument in making a downward departure, but the district court certainly did not abuse its discretion by declining to do so, nor do Lyons and Eremian cite any precedent to the contrary.  Because "[w]e generally respect the district court's sentence as long as the court has provided a plausible explanation, and the overall result is defensible," we do

so in this case as well.  United States v. Innarelli, 524 F.3d 286,
292 (1st Cir. 2008).

Lyons's and Eremian's remaining arguments are even less
deserving of substantial discussion.  The rule of lenity is a rule
of statutory interpretation and does not, contrary to Lyons's and
Eremian's assertions, apply to the reasonableness of sentences.
United States v. Aponte-Guzman, 696 F.3d 157, 160 (1st Cir. 2012).
Nor was the court obligated to depart downward based on Lyons's and
Eremian's argument (which the jury also apparently rejected) that
they had a good-faith belief their conduct was legal.  Finally,
Lyons's and Eremian's family ties were considered by the district
court in determining their sentences and its decision not to depart
downward on that basis was not an abuse of discretion.

Finally, we affirm the forfeitures as well.  The district
court, after a three-day bench trial, determined the total amount
of criminal proceeds[12] garnered by SOS and reasonably foreseeable
by Lyons ($24,504,126) and Eremian, ($7,766,095), and then entered
forfeiture judgments against them in those amounts.  See United
States v. Hurley, 63 F.3d 1, 22-23 (1st Cir. 1995) (holding that
forfeiture judgments against one participant in a conspiracy equal
to the reasonably foreseeable criminal proceeds obtained by others
in the conspiracy are appropriate).  The district court explained

---

[12]    Lyons and Eremian have not challenged the method the
district court used to calculate their forfeiture judgment, only
the proportionality of the total figure.

-54-

how it arrived at the total forfeiture amount in a detailed, thoughtful, and well-researched opinion. Lyons and Eremian do not challenge its factual conclusions in any detail, though they dismiss its factual finding in a conclusory manner in their reply brief. We review factual findings in sentencing for clear error, see United States v. Cintron-Echautegui, 604 F.3d 1, 5 (1st Cir. 2010), a standard Lyons and Eremian have not even come close to beginning to meet.

Lyons and Eremian contend that the imposition of the large forfeiture judgments against them was disproportionate given the lack of similar judgments against other participants in the SOS conspiracy. We have held, however, that it is entirely appropriate to impose "an order substituting other property of each defendant up to the value of the criminal proceeds for which the defendant was jointly and severally liable." United States v. Candelaria-Silva, 166 F.3d 19, 44 (1st Cir. 1999). The forfeiture judgments against Lyons and Eremian are also proportionate for the same reasons as their prison sentences are proportionate—they played a larger role in SOS than others and did not cooperate with prosecutors.

### III.  Conclusion

For the reasons stated above we affirm Lyons's and Eremian's convictions and sentences.

So ordered.