RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0133p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 24-1173

MALGUM WHITESIDE, JR.,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cr-00053-1—Robert J. Jonker, District Judge.

Argued: March 19, 2025

Decided and Filed: May 19, 2025

Before: CLAY, NALBANDIAN, and DAVIS, Circuit Judges

───────────────

## COUNSEL

───────────────

**ARGUED:** Takura Nyamfukudza, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant. John J. Schoettle, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Takura Nyamfukudza, CHARTIER & NYAMFUKUDZA, P.L.C., Okemos, Michigan, for Appellant. Andrew Byerly Birge, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge. The government charged Malgum Whiteside, Jr. with being a felon in possession of firearms. The firearms were uncovered during a search of his residence while officers looked for evidence related to his stalking charges. He moved to

suppress the firearms on the grounds that the warrant was invalid, and no warrant exception applied.  The district court denied the motion.  So Whiteside pleaded guilty but reserved the right to challenge the motion-to-suppress ruling.  He now appeals that ruling, and we affirm.

## I.

### A.

Malgum Whiteside began an extramarital affair with a nurse named J.C. in May 2018.[1] That fall, J.C. tried to end the relationship, but Whiteside resisted.  He threatened to tell her husband about the affair and to send both her husband and her employer explicit photos of her. Then, one day when she was arriving at work, Whiteside met her in the parking lot saying that he saw her at an intersection and was heading to the hospital where she worked to pick up a prescription.  That's when it began: Whiteside would regularly appear where J.C. was and threaten to tell her husband about the affair if she did not continue seeing him.  So she obliged and continued to see him for several years.

Whiteside was not physically abusive and never explicitly threatened violence, but "said vague things that resemble[d] threats" to J.C.  R.26-1, Case Report, p.5, PageID 110.  When the affair started J.C. did not know Whiteside had a violent criminal history, but she found out over time and became increasingly afraid of him.  In November 2021, after she refused to speak with Whiteside in the hospital parking lot, her car was keyed.  And then her husband's car door was damaged at their home.  Suspecting Whiteside was the culprit, J.C. decided to tell her husband about the affair and go to the police about Whiteside's escalating threats.  She made a report with the University of Michigan police since she worked at the University hospital.

University police agreed to escort her to her car when she was leaving work since that's usually when Whiteside showed up.  On February 6, 2022, an officer walked J.C. to the parking lot, and J.C. noticed Whiteside's car.  The officer approached Whiteside and verified his identity with his license.  When he did so, the officer discovered Whiteside's extensive criminal history: multiple larcenies, armed robberies, aggravated assault, and domestic violence charges.

---

[1]J.C.'s full name is omitted for privacy.

He informed Whiteside that J.C. did not want to see him anymore and told him he would be trespassing if he approached her at the hospital again.

Whiteside didn't stay away long.  On February 9, 2022, at roughly 2:15 a.m., J.C. called the police to report that while she was driving home from work that night, Whiteside appeared next to her at an intersection in his car.  Whiteside began speaking to her through the car window and J.C. recorded the conversation.  According to the police report, J.C. "can be heard pleading with Whiteside to stop contacting her" and not to release any photos of her.  R.26-3, Case Report, p.3, PageID 125.  Whiteside expressed frustration with her for going to the police, threatened to release intimate photos of her, and insisted that she give him her phone.  She agreed and the recording ended.  According to J.C., the two went to a parking lot to talk, and he continued to threaten to release photos of her.

Later that day, J.C. went to the police station to meet with Detective Mathews, who had been assigned the case.  J.C. detailed Whiteside's increasingly threatening behavior and showed Mathews several texts to prove it.  Mathews then obtained a felony warrant charging Whiteside with aggravated stalking, capturing/distributing images of unclothed persons, and use of a computer to commit a crime.  Mathews and another officer, Detective Cavanaugh, then patrolled the medical campus around the time J.C.'s shift ended to find Whiteside.  They found his car, ran his plate through the Law Enforcement Information Network (LEIN), which confirmed Whiteside was the owner, and took him into custody.

**B.**

Detective Mathews sought two search warrants: one for an apartment on Harwick Drive and another for Whiteside's car.  In the affidavit accompanying the Harwick Drive search warrant, Mathews described the Harwick apartment in detail.  The warrant sought three categories of evidence: (1) "[a]ny printed images depicting the victim . . . and/or any related evidence of stalking"; (2) "[a]ny computer devices to include cellular phones, laptop computers, tablet computers, USB drives or any electronic media capable of storing data/images/videos"; and (3) "[a]ny mail or other documents" showing Whiteside lived in the Harwick apartment. R.21-2, Aff. & Search Warrant, p.5, PageID 60.

For probable cause, Mathews attested to his over twenty-four years of law enforcement experience and current position in the University of Michigan Police Department Criminal Investigations Unit. He explained that he was assigned to the case on February 7 and reviewed the other officers' reports. These reports detailed J.C.'s affair with Whiteside and how the earlier officers identified Whiteside from his Michigan driver's license and told him to no longer contact J.C. The affidavit also outlined J.C.'s recorded interaction with Whiteside in the early hours of February 9 and his threats to release sexually explicit photos of her. Mathews also described his interview with J.C. and how she described a pattern of Whiteside keeping her in the relationship "through [the] use of fear, coercion and intimidation." *Id.* at p.3, PageID 58. And how he threatened to "escalate[] things" if J.C. did not meet with him. *Id.*

Mathews also described other reports on Whiteside that he had reviewed as part of his investigation. These reports were from various police departments detailing how Whiteside distributed sexually explicit photos of a woman during a prior relationship by placing them in mailboxes around her neighborhood. He had also sent a DVD to a victim's adult daughter depicting him and the victim having sex. Mathews also noted that he ran Whiteside's license plate through the LEIN on the night of his arrest for the J.C. stalking charges.

Finally, Mathews wrote that in his interview with J.C. she told him Whiteside owns a laptop and saw him use it at his house and at the hospital. She also said he had a cellphone, and she saw pictures of herself on the phone. She believed Whiteside had kept photos of her that he claimed to have deleted at her request. And she suspected he had more photos of her that were taken without her knowledge or consent. Mathews explained that, based on his training and experience, Whiteside could likely connect his phone to his laptop to store images or burn onto a DVD. Lastly, Mathews noted that a Lansing Township Police Sergeant responded to the Harwick apartment to provide him with the physical description of the property, confirm the address, and confirm that it was in his township.

After drafting the warrant affidavit, Detective Mathews had a prosecuting attorney review it. The attorney signed each page to show she had reviewed it. Then, Mathews contacted Judge Karen Valvo's office to swear the warrants. Mathews called the judge and she administered the oath. Judge Valvo's judicial coordinator returned the warrant application to Mathews in an

email saying, "Attached are the signed copies." R.26-6, Emails, p.3, PageID151; *see also* R.58, Hr'g Tr., p.45, PageID 438. Mathews saw the judge's signature on the first page of the affidavit and assumed the warrant was authorized. So he briefed Cavanaugh and his team on the case and Whiteside's criminal history.

Before the briefing, Cavanaugh received a copy of the warrant from Mathews, and Mathews confirmed that the judge had reviewed it. Cavanaugh noticed that Judge Valvo had only signed the first page of the affidavit, not the warrant itself, but he was not concerned because the judge's name and bar number were stamped on the remaining pages. So Cavanaugh went ahead with the search, which Mathews did not join. When Cavanaugh entered Whiteside's bedroom, he saw two handguns tucked on the right side of the bed between the box spring and the bed frame. The guns were not listed on the warrant, but Cavanaugh seized them anyway. He knew that Whiteside was a felon—the police reports and Mathews' briefing confirmed as much, and because Whiteside appeared to be the sole occupant of the apartment, his mere possession of the firearms was evidence of a crime.

## C.

Whiteside was indicted in federal court on one count of being a felon in possession of the firearms seized from his apartment.[2] He moved to suppress the evidence obtained from the search, arguing the Harwick Drive warrant was not properly issued because it was not signed— only the affidavit was. After hearing argument, the district court held an evidentiary hearing on the motion. Judge Valvo, her judicial coordinator, Detective Mathews, and Detective Cavanaugh testified.

Judge Valvo testified about her process for warrants: the paperwork is sent to her judicial coordinator; the coordinator prints them, reviews them, and stamps the judge's name and date on them. After that, the judge contacts the officer, administers the oath, reviews the affidavit and the warrant, and signs each page. She identified the warrant and affidavit at issue and confirmed she signed the first page and reviewed the whole document. But she was "at a loss to understand

---

[2]Whiteside pleaded guilty to two counts in state court in September 2022: aggravated stalking and using a computer to commit a crime. The charge of capturing/distributing images of an unclothed person was dismissed.

why" she had not signed the warrant itself. R.58, Hr'g Tr., p.14, PageID 407. And she knew she had not rejected the warrant because she would have drawn a line through the warrant if she was not authorizing it, and she had not done that. Judge Valvo's judicial coordinator also confirmed that process and noted that the judge would not have given her the documents if she had not approved them.

During closing arguments, Whiteside's counsel also argued that the affidavit did not include facts that showed a nexus between the criminal activity and Whiteside's residence. The government defended the warrant's validity, but also argued the search could be saved by the good-faith exception to the warrant requirement and that the firearms were in plain view. The court invited the parties to give supplemental briefing on the nexus and good-faith issues, and they did.

The district court denied the motion to suppress. In a written order, it found that the lack of a signature did not determine whether the warrant was "issued" under the Fourth Amendment. And that while "[t]he residence warrant d[id] not contain abundant evidence of [a] nexus," "there [wa]s enough . . . to pass muster." R.37, Op. & Order, p.16, PageID 243. In the alternative, the court found the good-faith exception would not require suppression of the evidence. Finally, the court found the firearms were within the scope of the warrant's reach or, in the alternative, they were within plain view.

Whiteside entered a plea agreement that allowed him to appeal the adverse ruling on the motion to suppress. He was sentenced to sixty months' imprisonment and three years of supervised release. He timely appealed.

**II.**

When reviewing a motion to suppress, we apply a "mixed standard of review"—factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *United States v. Taylor*, 121 F.4th 590, 594 (6th Cir. 2024). And when a district court denies a motion to suppress, "we consider the evidence in the light most favorable to the government." *Id.* (internal quotation marks omitted). We also keep in mind the scope of the district court's inquiry: it gives "great deference" to the issuing judge and asks "whether the issuing judge had a 'substantial

basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)), *cert. denied*, 145 S. Ct. 603 (2024). So we proceed "mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant." *Id.*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A valid warrant under the Fourth Amendment requires three things. First, a neutral, disinterested magistrate must issue the warrant. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Second, the warrant or warrant affidavit must show that there is probable cause to believe that the evidence being sought will further the "apprehension or conviction" for a specific offense. *Id.* (internal quotation marks omitted). Finally, the warrant must describe with particularity what officers may search and seize. *Id.*

Whiteside offers two theories for why the warrant was constitutionally infirm. First, he claims the affidavit lacked probable cause because it did not show a nexus between the place to be searched and any evidence to be found. Second, he claims that it was not validly issued because the judge did not sign it. Both arguments fail.

**A.**

First, probable cause. To decide whether the warrant shows probable cause, the issuing magistrate must make a "practical, common-sense decision" that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A necessary part of this inquiry is the "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted). The warrant affidavit must set forth "reasonable grounds to believe that contraband will be located on the property to be searched." *Sanders*, 106 F.4th at 461 (internal quotation marks omitted). And we look to the "totality of the circumstances in a realistic and commonsense fashion" to decide whether the affidavit meets this requirement.

*United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (internal quotation marks omitted).

We also "afford considerable weight to the conclusion[s] of experienced law enforcement officers" on "where evidence of a crime is likely to be found." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (internal quotation marks omitted). And not everything must be said explicitly—courts are "entitled to draw reasonable inferences about where evidence is likely to be kept." *Id.* Still, the inquiry "is limited to the information presented in the four[ ]corners of the affidavit" and the inferences reasonably drawn from that information. *United States v. Sumlin*, 956 F.3d 879, 885 (6th Cir. 2020) (internal quotation marks omitted); *Williams*, 544 F.3d at 686.

Probable cause is a highly fact-intensive inquiry, but our cases have sketched out what is necessary to show a nexus. To start, we have asserted the general principle that "an issuing judge may infer that a criminal suspect keeps the instrumentalities and fruits of his crime in his residence." *Williams*, 544 F.3d at 688 (internal quotation marks omitted). *Williams* concluded that a search warrant showed a sufficient nexus between Williams' suspected possession of handguns and his residence. *Id.* at 686–87. The warrant named the place to be searched as Williams' residence, had corroborating evidence of his possession of several handguns and use of a handgun to rob a drug trafficker, and outlined his prior arrest for carrying a concealed weapon and a recent arrest for possession of a vehicle where a gun was found. *Id.* at 685. The panel concluded that "[g]iven the evidence that Williams possessed multiple guns, and had recently used them to further his criminal activity, the issuing judge could have reasonably inferred that Williams kept at least one handgun at his residence." *Id.* at 688. So the nexus requirement was met. *Id.*

On the other hand, in *United States v. Brown*, we found a warrant affidavit lacking when it "contained *no* evidence that [the defendant] distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there." 828 F.3d 375, 382 (6th Cir. 2016) (emphasis added). The defendant was also not a known drug trafficker and law enforcement had not surveilled the house. *Id.* The only evidence linking him to the house was a

car registered to that address.  *Id.* at 383.  And the panel said that was "too vague and generalized a nexus to support the search warrant."  *Id.*

Again, these are fact-specific inquiries.  But there are helpful differences between these two cases.  The affidavit in *Williams* showed that the defendant was actively engaging in gun-related criminal activity, and it was reasonable for the issuing judge to infer that the guns had to be kept somewhere.  544 F.3d at 688.  And "[m]uch like a bank robber would keep the proceeds and instrumentalities of his robbery in his home," "it was reasonable to conclude that [the defendant] kept at least one of the handguns sought at his residence."  *Id.*  But in *Brown*, the affidavit lacked recent evidence of criminal activity and nothing in the affidavit pointed to the home.  828 F.3d at 382–83.  So a nexus could not be reasonably inferred.

As for this case, Whiteside alleges that the warrant affidavit did not put forth a sufficient nexus between his apartment and his suspected criminal activity.  We disagree.  The warrant sought stalking evidence.  Specifically, any printed images of the victim and any computer devices, including phones, laptops, USB drives, or any electronic media capable of storing data/images/videos.  It also sought "[a]ny mail or other documents showing residence/ownership of Malgum Whiteside living at" the Harwick apartment.  R.21-2, Aff. & Search Warrant, p.2, PageID 57.  There is evidence in the affidavit that pointed directly to why this evidence would exist at Whiteside's home: the victim, J.C., said that Whiteside owned a laptop that she had seen at his residence.

The affidavit further detailed why this laptop would have evidence of his stalking.  Whiteside has "threaten[ed] to disclose graphic sexual images" of J.C., including by "mak[ing] DVD copies of the images for distribution."  *Id.* at p.3, PageID 58.  Whiteside has done this before.  The affidavit explained that he had a criminal history involving "sen[ding] a DVD to [a victim's] adult daughter . . . that . . . depicted [him] having sexual intercourse with the [victim]."  *Id.*  Just three days before the search, Whiteside showed J.C. that he had explicit photos of her on his phone, including photos he claimed to have deleted previously and some that may have been taken without her knowledge.  *Id.*  And the affiant knew from his training and experience that Whiteside's cell phone could be connected to a laptop to store the images, make copies of them, or burn them onto a DVD.  *Id.* at p.4, PageID 59.

J.C. attested that Whiteside had explicit photos of her on his phone and that he kept a laptop in his home.  Combined with his past criminal conduct and the considerable weight we afford law enforcement conclusions—like the one here about the use of laptops—the information in the affidavit is sufficient to establish the reasonable inference that there was evidence of Whiteside's wrongdoing in his home.  This case is not like *Brown*; the affidavit here had recent evidence of criminal activity and contained credible evidence pointing to the home.

There is plainly a nexus here, so Whiteside tries another approach: he argues that the affidavit didn't show that the Harwick apartment was his residence.[3]  So, in Whiteside's view, the evidence linking the laptop to his residence still fails to link the laptop *to the Harwick apartment*.  But this argument  defies a commonsense reading of the warrant.  Again, we read warrants in a "realistic and commonsense fashion."  *Van Shutters*, 163 F.3d at 336 (internal quotation marks omitted).  And we are "entitled to draw reasonable inferences" from the information presented.  *Williams*, 544 F.3d at 686 (internal quotation marks omitted).  Yes, the affidavit did not explicitly say that the Harwick apartment was Whiteside's residence, but the totality of the information presented—particularly the details of Detective Mathews' investigation—support the reasonable inference that it was Whiteside's residence.

Mathews explained that Whiteside showed his Michigan driver's license to police when officers stopped him outside the hospital on February 7.  This license would have had Whiteside's address on it.  Mathews also ran Whiteside's car's license plate through LEIN.  This report would have included Whiteside's address.  Finally, Mathews had a Lansing Township Police Sergeant respond to the Harwick apartment, provide him with the physical description of it, and "confirm[] the address."  R.21-2, Aff. & Search Warrant, p.4, PageID 59.  And the fact that the warrant sought mail or other documents showing Whiteside currently lived at the apartment, indicates that the officers had a basis for believing it was his home and just needed to confirm that fact.  All of this would lead an issuing judge to reasonably infer that Mathews knew the address of Whiteside's residence and knew that it was the Harwick apartment.

---

[3]Whiteside doesn't deny that the Harwick apartment is, in fact, his residence.  If he did, he would likely lack standing to challenge the search since "a defendant has standing only if he has a Fourth Amendment interest in the property searched."  *United States v. Russell*, 26 F.4th 371, 377 (6th Cir. 2022).  Rather, he limits his argument to the sufficiency of the affidavit on this point.

As the district court pointed out, "while the better practice perhaps would have been for the warrant to expressly state that Mr. Whiteside lived at the address," that "omission is not fatal here." R.37, Op. & Order, p.17, PageID 244.  Reading the whole affidavit, the information could be inferred.  And because the issuing court could infer that Whiteside lived at the Harwick apartment and Whiteside's residence would have evidence of his stalking, the warrant had a sufficient nexus to pass constitutional muster.

Whiteside contends that this conclusion requires this court to look beyond the four corners of the warrant affidavit to the contents of the LEIN report.  This, he argues, would be impermissible since the issuing court's review is limited to the four corners of the affidavit. *Sumlin*, 956 F.3d at 888.  But we disagree.  A court need not look at either Whiteside's driver's license or the LEIN report to know these things generally have the subject's address.  This is common knowledge to a judge, and probable cause is a commonsense inquiry.  Plus, the detailed description of the Harwick apartment and the Lansing Sergeant's confirmation of the address support the inference that Mathews learned the address during his investigation.  Whiteside wants the affidavit to include a sentence explicitly saying that Whiteside lived at the Harwick apartment.  But this court does not engage in this type of "line-by-line scrutiny" of an affidavit. *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001).  Rather, it looks at the totality of the circumstances to see if the magistrate had a "substantial basis for a finding of probable cause." *Id.*  And the affidavit here met that "low bar."  *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021).

Whiteside's challenge to the warrant based on its nexus fails.

**B.**

Whiteside's next attack on the constitutionality of the warrant is that it's unsigned. According to Whiteside, because the judge only signed the first page of the warrant affidavit, it was not "issued by [a] neutral, disinterested magistrate[]" as required by the Fourth Amendment. *Dalia*, 441 U.S. at 255.

We brushed up against this question in *United States v. Beals*, 698 F.3d 248, 263 (6th Cir. 2012).  There, Tennessee law required an issuing magistrate to prepare an original and two

copies of a search warrant and sign all three. *Id.* at 263. The magistrate prepared three copies, but only signed the original, which he kept for his records. *Id.* at 262. The officers brought the unsigned warrant to the house and conducted the search. *Id.* When facing federal charges based on evidence uncovered during the search, the defendant argued the search was invalid since it was done with an unsigned warrant. *Id.* at 263–64. But it was not a problem "under the Fourth Amendment that the officers executed an unsigned copy of the warrant. Doing so did not make the warrant any less 'issued.'" *Id.* at 265 (citation omitted). And because the magistrate signed *a* copy of the warrant, there was sufficient evidence that the warrant was issued even if that copy did not make it to the executing officer. *Id.* So suppression in federal court was unwarranted. *Id.*

We acknowledged that had the magistrate "failed to sign *any* copy of the warrant, it might plausibly be maintained that a warrant never issued in the first place as *a matter of fact*." *Id.* at 264. Whiteside tries to read this to say an unsigned warrant cannot be issued as a matter of law. But *Beals* does not require such an unequivocal rule. At most, this statement implies an additional *factual* inquiry into whether the warrant was issued may be necessary. *Id.* And reading the statement as a per se rule would put our court out of step with every other circuit to consider the question. *See United States v. Lyons*, 740 F.3d 702, 724 (1st Cir. 2014) ("[W]e see nothing in the Fourth Amendment that conditions the validity of a warrant on its being signed."); *United States v. Cruz*, 774 F.3d 1278, 1285 (10th Cir. 2014) (agreeing with and adopting the First Circuit's reasoning); *cf. United States v. Lipford*, 203 F.3d 259, 270 (4th Cir. 2000) (upholding search when defendant was handed an unsigned copy of the warrant by law enforcement because "this was, at most, a technical violation of Federal Rule of Criminal Procedure 41(d), and not a violation of the Fourth Amendment"); *United States v. Turner*, 558 F.2d 46, 50 (2d Cir. 1977) ("As long as the magistrate in fact performs the substantive tasks of determining probable cause and authorizing the issuance of the warrant, the amendment is satisfied.").

We agree with the other circuits to have considered the topic that the Fourth Amendment's text does not require a signature for a warrant to be issued. Like the First Circuit explained, the Fourth Amendment expressly says what is required for a warrant to issue:

"a particular description of the 'place to be searched' and 'persons or things to be seized.'" *Lyons*, 740 F.3d at 725. From there, a warrant has been "issued" when "it has been supported by an oath or affirmation and a neutral and detached magistrate makes a probable cause determination." *Id.* Once that probable cause determination has been made, there is "no convincing reason to find implicit in the Fourth Amendment a constitutional mandate that the magistrate who has made a probable cause determination also sign the warrant." *Id.* And we have found no history that compels a contrary conclusion.[4]

Further, a strict signature requirement would depart from our and other courts general approach to warrants. We have at least once acknowledged that "ministerial" defects in a warrant "do not void an otherwise valid search" "absent a showing of prejudice." *Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996) (finding that a search was valid despite the officer violating a federal rule that required him to provide the person whose premise was being searched a copy of the warrant). Likewise, federal appellate courts consistently reject "formalistic approaches to signatures in warrants by federal appellate courts." *Lyons*, 740 F.3d at 725 (citing *Beals*, 698 F.3d at 264–65 and *Lipford*, 203 F.3d at 270).

That is not to say a signature on a warrant has no value. It provides "easy and reliable proof that a warrant was in fact issued." *Id.* at 726. It also avoids post hoc litigation (which may not occur until years later) and provides clarity for both suspects and the courts. But just because

---

[4]Our brief investigation revealed no clear historical answer on whether a search warrant must be signed to be issued. In describing the requirements of a valid arrest warrant, Blackstone notes that the "warrant ought to be under the hand and seal of justice." 5 W. Blackstone, *Commentaries* 290 (St. George Tucker ed. 1803) (1767). He also mentioned that for an arrest warrant outside the court's jurisdiction to be valid, it "must be backed, that is, signed by a justice of the peace" in the county where apprehension is sought. *Id.* at 291. Similarly, Hale said that a justice of the peace "must issue his warrant in writing under his seal to apprehend" a suspect. 2 Sir Matthew Hale, *Historia Placitorum Coronæ: The History of the Pleas of the Crown* 86 (1736). But this language applies to arrest warrants, not search warrants. And even today, Federal Rule of Criminal Procedure 4(b)(1)(D) requires that an *arrest* warrant be signed, but there is no similar, explicit requirement for *search* warrants under Rule 41.

Regardless, neither party provides briefing on the original meaning of the Fourth Amendment and any signature requirement. It is well established that "[i]n our adversarial system of adjudication, we follow the principle of party presentation." *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 n.6 (2022) (alteration in original) (internal quotation marks omitted). So while we "decide [this] case based on the historical record compiled by the parties" (or lack thereof), we do not foreclose the possibility that further historical briefing in a different case could reveal a different answer. *Id.*

a signature is preferred, does not mean it is required.  A warrant is not per se invalid simply because it is unsigned.

So the question is whether the warrant *here* was valid.  If a neutral and detached magistrate does not make a probable cause determination, any search based on the warrant is invalid unless a warrant exception applies.  *Hoover v. Garfield Heights Mun. Ct.*, 802 F.2d 168, 171 (6th Cir. 1986).  To make that assessment, as *Lyons* explained, we look to "clear and contemporaneous evidence" that the magistrate made the "proper probable cause determination" and approved the warrant's issue, even though the warrant lacks a signature.  740 F.3d at 726. There, the state justice signed the warrant application and the accompanying affidavit but forgot to sign the actual warrant.  *Id.* at 724.  Nevertheless, what the state justice did was enough to show that he had both reviewed the application and determined that probable cause existed.  *Id.*

Here, it is undisputed that Judge Valvo called Detective Mathews and administered the oath.  And despite not signing the warrant, she showed that she made the necessary probable cause determination.  She signed the first page of the affidavit and did not strike through any pages like she would have if she had not approved it.  And her coordinator confirmed the judge would not have given her the documents if they had not been approved.  The coordinator's email indicating that the documents were "signed" also reflects her belief that the judge had made the necessary probable cause determination.  R.26-6, Emails, p.3, PageID 151.  As in *Lyons*, the "clear and contemporaneous" evidence suggests Judge Valvo reviewed the warrant, determined probable cause existed, and signed the accompanying affidavit.  So the warrant was validly issued.

Both of Whiteside's constitutional challenges to the warrant fail.  Because we find it was validly issued, we need not consider the search's validity under the good-faith exception to the warrant requirement.  *United States v. Simmons*, 129 F.4th 382, 391 (6th Cir. 2025).

## III.

A warrant must "particularly describe the things to be seized."  *Dalia*, 441 U.S. at 255 (internal quotation marks omitted).  Even if a warrant is validly issued, when an officer seizes items "beyond the scope of a warrant's authorization," he runs the risk of violating the Fourth

Amendment. *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 554 (6th Cir. 2003). The Fourth Amendment generally requires that either an officer request a new warrant to seize items not in the warrant's scope or that an exception to the warrant requirement must apply. *Id.*

Whiteside argues that the firearms seized during the search of his Harwick apartment were outside the scope of the warrant. And he says that the plain-view exception to the warrant requirement does not apply. So the district court erred in refusing to suppress the firearms. The government, for its part, contends that the scope of a warrant seeking evidence of stalking necessarily covers firearms. But we find that the plain-view exception applies so we need not consider the scope of the warrant.

As with the other claims under a motion to suppress, we review the district court's legal conclusions de novo and will uphold factual findings unless they are clearly erroneous. *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002).

Under the plain-view doctrine, an item discovered in a warrantless search will not be suppressed when (1) the "officer saw [it] from a lawful vantage point," (2) the "'incriminating character' of [it] was 'immediately apparent,'" and (3) the "officer had 'a lawful right of access to the object itself.'" *United States v. Clancy*, 979 F.3d 1135, 1137 (6th Cir. 2020) (quoting *Horton v. California*, 496 U.S. 128, 136–37 (1990)).

Let's start with the third requirement for simplicity. Whiteside contends that the officers did not have lawful access to his home because the warrant was invalid. Because we have already concluded the warrant was valid; the officers had legal authority to enter Whiteside's home. So the only issues under the plain-view doctrine are whether Detective Cavanaugh could see the firearms while looking for other evidence within the scope of the warrant and whether the incriminating character of the firearms was immediately apparent.

Whiteside claims that Detective Cavanaugh "had to rearrange furniture and manipulate the items to see [the firearms]." Appellant Br. at 55. At the evidentiary hearing on the motion to suppress, Cavanaugh testified that when he entered the room, he could see two handguns on the right side of the bed between the box spring and the frame because of the angle of the bed. The government also introduced photos from the search that show a handgun tucked on the side of

the bed frame.  So the district court's conclusion that the firearms were visible from a lawful vantage point was not clearly erroneous.

But even if Whiteside is correct that Cavanaugh moved furniture to bring the handguns into view, that would be permissible.  The warrant allowed officers to look for "[a]ny computer devices to include cellular phones, laptop computers, tablet computers, USB drives or any electronic media capable of storing data/images/videos."  R.21-2, Aff. & Search Warrant, p.2, PageID 57.  To find a small item like a USB drive, Cavanaugh could reasonably rearrange furniture or move things in the room and still be searching from a lawful vantage point.  *See United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) ("[G]iven that the warrant authorized the officers to look anywhere on [the defendant]'s property for a small, easy-to-conceal item, it would be extremely difficult for [the defendant] to establish that the officers searched in places not authorized by this particular warrant.").

Finally, Whiteside argues that the incriminating character of the firearms was not immediately apparent because the officers had no reason to believe that the firearms were contraband when they saw them.

To determine whether probable cause is immediately apparent, we consider three factors: (1) the nexus between the seized object and the items particularized in the warrant; (2) "whether the intrinsic nature or appearance of the seized object gives probable cause" to associate it with criminal activity; and (3) whether the "officers can at the time of discovery" based "on the facts then available to them determine probable cause of the object's incriminating nature." *United States v. Pacheco*, 841 F.3d 384, 395 (6th Cir. 2016) (internal quotation marks omitted).  And "'assuming that there is probable cause to associate the property with criminal activity,' however, a plain view seizure is 'presumptively reasonable' and does not require an 'unduly high degree of certainty.'"  *Shamaeizadeh*, 338 F.3d at 554 (alteration omitted) (quoting *Texas v. Brown*, 460 U.S. 730, 741–42 (1983)).

Guns fall in an unusual position on the second factor since their possession can be both lawful and unlawful.  But in *United States v. Truitt*, we explained that an officer can reasonably conclude that a firearm is incriminating evidence based on the facts and circumstances

surrounding the search. 521 F.2d 1174, 1176 (6th Cir. 1975). There, the officers were searching for gambling paraphernalia and discovered a sawed-off shotgun. *Id.* The court acknowledged that the shotgun was not per se contraband and could be lawfully owned. *Id.* But the core question is "whether probable cause existed"—not whether it is evidence that "establishes the guilt of a given defendant beyond a reasonable doubt." *Id.* at 1176–77. And probable cause looks at the "facts and circumstances within . . . the officers'[] knowledge" to decide whether "a police officer of reasonable caution [is justified] in believing that an offense has been or is being committed and that the object is evidence incriminating the accused." *Id.* at 1177 (internal quotation marks omitted).

So the court acknowledged that it was "common knowledge, sawed-off shotguns are not used by the average law abiding citizen," and that "[t]here was no readily available explanation of a lawful possession either by the proprietor or by the person whose name was on the tag." *Id.* at 1177–78. Finally, the circumstances contained in the affidavit provided "sufficient evidence" for the officer to reasonably conclude the "sawed-off shotgun was incriminating evidence." *Id.* at 1178. The shotguns standing alone were not per se contraband, but in context, there was probable cause to associate the firearms with illegal activity. And when applying a warrant exception, probable cause can be gleaned from an officer's background knowledge. *Id.* at 1177 (citing *Carroll v. United States*, 267 U.S. 132, 162 (1925)). During a warrantless search "officers [are] entitled to use their reasoning faculties upon all the facts of which they had previous knowledge in respect to the defendants" to establish probable cause. *Carroll*, 267 U.S. at 161; *see also Brinegar v. United States*, 338 U.S. 160, 177–78 (1949) ("[T]he facts within the officers' knowledge when they intercepted the . . . defendants amounted to more than mere suspicion and constituted probable cause for their action.").

So to determine whether there is probable cause to believe that a firearm is incriminating, we consider the circumstances known to the officer, including both common knowledge and the facts of the case. If further investigation is needed to create a probability of unlawfulness, there is likely not probable cause to seize the gun. *See Shamaeizadeh*, 338 F.3d at 555 ("Because further investigation would be necessary to establish probable cause of the existence of a relationship between the jewelry and illegal drugs or drug paraphernalia . . . there was no clear

nexus between the jewelry seized and the items particularized in the search warrant." (internal quotation marks omitted)). But when the officer's background knowledge and the facts available to him make it reasonable to conclude that the gun is evidence incriminating the accused, the seizure is permitted. *Truitt*, 521 F.2d at 1176–77; *Carroll*, 267 U.S. at 160; *see also United States v. Williams*, 289 F. App'x 868, 871 (6th Cir. 2008) (affirming denial of a motion to suppress a firearm when "the officers knew from previous dealing that [the defendant] was a felon").

Here, Detective Cavanaugh knew Whiteside was a felon. First, Detective Mathews reviewed two reports from other officers on Whiteside, and both detailed his criminal history. Mathews also did his own criminal history check on Whiteside the day before the search and confirmed his felon status. When Mathews and Cavanaugh looked for Whiteside, they discussed his felon status. They again confirmed it by reviewing his criminal history in preparation for the arrest. Mathews also hosted a briefing with Cavanaugh and other officers before the search of Whiteside's home. Again, they discussed his felon status.

Cavanaugh also testified about these conversations with Mathews and said that he independently reviewed Whiteside's criminal history. So when he saw the handguns in Whiteside's bedroom, he reasonably concluded that the guns were incriminating evidence. The officers were entitled to draw upon all the facts of which they had previous knowledge about Whiteside to establish probable cause to seize the firearms. And because there was probable cause to associate the property with criminal activity, the "plain view seizure [wa]s 'presumptively reasonable' and d[id] not require an 'unduly high degree of certainty.'" *Shamaeizadeh*, 338 F.3d at 554 (quoting *Brown*, 460 U.S. at 741–42).

Whiteside argues that since a woman's clothes were found in a drawer in another room in the home, the officers could not be sure that he was the sole occupant or that the firearms belonged to him. This stretches the facts too far. A search report detailed various miscellaneous items found throughout the house, including a woman's clothes. But in the next paragraph, the officer wrote that "there was no indication of a woman's influence, children, or anyone else living in the apartment besides Whiteside." R.26-7, Officer Narrative, p.6, PageID 167.

Cavanaugh also testified that Whiteside appeared to be the apartment's sole occupant. And that he did not know of anyone else's clothes being found in the apartment. He also noted that another officer surveilled the apartment that morning and did not see any visitors coming or going. So the presence of other clothes somewhere in the apartment doesn't cast doubt on Cavanaugh's conclusion that the firearms were evidence of a crime by Whiteside.

Because Cavanaugh saw the handguns from a lawful vantage point, their incriminating character was immediately apparent, and he had a lawful right to access the handguns, the seizure was valid.

## IV.

For these reasons, we affirm.